# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| STEPHANIE R. GREEN, *et al.*,<br>on Behalf of Themselves and All Others<br>Similarly Situated, | )<br>)<br>) |  |
|  | ) |  |
| **Plaintiffs,** | ) | **Case No. 09-CV-2380-JAR-JPO** |
|  | ) |  |
| **v.** | ) |  |
|  | ) |  |
| **HARBOR FREIGHT TOOLS USA, INC.,** | ) |  |
|  | ) |  |
| **Defendant.** | ) |  |
| _____ | ) |  |

## MEMORANDUM AND ORDER

Plaintiffs bring this collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), against defendant Harbor Freight Tools ("Harbor Freight"), claiming they were misclassified as exempt from the FLSA's overtime requirements and are owed overtime compensation. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 445) with respect to Plaintiff Brent Foster,[1] as well as its Motion for Summary Judgment (Doc. 447) with respect to Plaintiffs Stephanie Green, Trey Pace, Dennis Collins, and Andy VanMeter. Plaintiffs responded and Defendant filed a Motion to Strike Testimony of Kent Koentopp and Ray Shadel from consideration in Plaintiffs' responses (Doc. 458). For the reasons explained in detail below, Defendant's motions are denied.

## I. Procedural Background

Plaintiffs filed suit against Harbor Freight on July 21, 2009, claiming they were misclassified as exempt from the FLSA's overtime requirements, and are owed overtime

---

[1] Defendant's Motion for Summary Judgment with respect to Defendant Foster filed earlier in these proceedings was denied without prejudice. Doc. 210.

compensation for the time they worked.  Plaintiffs filed their claims on their own behalf and on

behalf of others who are "similarly situated."  On August 17, 2010, this Court conditionally

certified the following class:

> Individuals employed by Harbor Freight Tools USA, Inc. and any
> predecessors from the time period three years from the date of the
> Court's order to the present with the title Store Manager at any
> Harbor Freight Tools retail store.[2]

On August 17, 2012, this Court granted Defendant's motion to decertify the conditionally

certified class of workers, and dismissed without prejudice the claims of the thirty-one opt-in

claimants.[3]  While recognizing that the collective class had made a general showing of similarity

with respect to some aspects of their positions as Store Managers, the Court concluded that given

the fact intensive nature of the executive exemption analysis, Plaintiffs did not demonstrate that

they were "similarly situated" to the extent necessary to make collective treatment of their claims

proper and efficient under the FLSA.[4]

Harbor Freight now moves for summary judgment on the claims of the five remaining

named Plaintiffs.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine

dispute as to any material fact and [it] is entitled to judgment as a matter of law."[5]  A fact is only

---

[2]Doc. 98.

[3]Doc. 444.

[4]*Id*. at 23.

[5]Fed. R. Civ. P. 56(a).

material under this standard if a dispute over it would affect the outcome of the suit.[6] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[7] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[8]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[9] Where, as here, the movant bears the burden of proof on a claim or defense, it must show that the undisputed facts establish every element of the claim entitling it to judgment as a matter of law.[10] If the moving party properly supports its motion, the burden shifts to the non-moving party, "who may not rest upon the mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[11] In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[12] If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may

---

[6]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7]*Id.*

[8]*Id.* at 251–52.

[9]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[10]*See id.* at 331 ("If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c) that would entitle it to a directed verdict if not controverted at trial.").

[11]*Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir. 1993).

[12]*Adler v. Wal-Mart Stores, Inc.*,144 F.3d 664, 671 (10th Cir. 1998).

be granted.[13]  A party opposing summary judgment "cannot rely on ignorance of the facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."[14]  Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."[15]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16]

## III.    Motion to Strike

Before determining the uncontroverted facts in this matter, the Court must address Harbor Freight's motion to strike.  The standards for ruling on a motion to strike are well established.  Rule 12(f) of the Federal Rules of Civil Procedure provides that the court may order stricken from any pleading "any redundant, immaterial, impertinent or scandalous matter."[17]  Because striking an entire pleading, or a portion thereof, is a drastic remedy, and because a motion to strike may often be brought as a dilatory tactic, motions to strike under Rule 12(f) are generally disfavored.[18]  The decision to grant a motion to strike lies within the court's sound

---

[13]*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994).

[14]*Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1998), *aff'd* 939 F.2d 910 (10th Cir. 1991).

[15]*Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

[16]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[17]Fed. R. Civ. P. 12(f).

[18]*Thompson v. Jiffy Lube Int'l, Inc.*, No. 05-1203-WEB, 2005 WL 2219325, at *1 (D. Kan. Sept. 13, 2005); *Pencro Assoc., Inc. v. Sprint Corp.*, No. 04-2459-JWL, 2005 WL 950626, at *1 (D. Kan. Apr. 25, 2005);

discretion.[19]

Here, Harbor Freight moves to strike the deposition testimony of former District Managers Kent Koentopp and Ray Shadel as well as other plaintiffs and/or opt-in plaintiffs from Plaintiffs' response in opposition to summary judgment, on the grounds that such testimony lacks the personal knowledge necessary to refute Plaintiffs' own admissions and Harbor Freight's other material facts under Fed. R. Civ. P. 56(e), D. Kan. Rule 56.1(d) and Fed. R. Evid. 602. In the alternative, Harbor Freight asks the Court to disregard those portions of the testimony that do not meet the requirements of those rules. Harbor Freight does not identify specific objectionable testimony, but objects to the testimony in its entirety.

The amendments to Fed. R. Civ. P. 56(c), effective December 1, 2010, provide the appropriate summary judgment procedures for setting forth the parties' factual positions. This includes the provision that "a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[20] The advisory committee notes on this amendment explain:

> The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment state does not forfeit the right to challenge admissibility at trial.[21]

---

[19]*Geer v. Cox*, 242 F. Supp. 2d 1009, 1025 (D. Kan. 2003).

[20]Fed. R. Civ. P. 56(c)(2). Defendant's motion for summary judgment and motion to strike were filed in October and November 2012, respectively, and are subject to the amended version of Rule 56 which became effective December 1, 2010.

[21]Fed. R. Civ. P. 56 advisory committee's note.

Local Rule 56.1(d) deals with presentation of factual material, and states in relevant part:

> All facts on which a motion or opposition is based must be
> presented by affidavit, declaration under penalty of perjury, and/or
> relevant portions of pleadings, depositions, answer to
> interrogatories and responses to requests for admissions.
> Affidavits or declarations shall be made on personal knowledge
> and by a person competent to testify to the facts stated that are
> admissible in evidence. [22]

The Court stresses that Harbor Freight's Motion to strike is not the proper method to address Koentopp and Shadel's testimony.[23] The proper method is to dispute the facts relied on in the deposition testimony as not supported by admissible evidence. It suffices that the party objecting to summary judgment material simply state the objection with a brief description (akin to a speaking objection) and citation to the Federal Rule or case upon which the objection is based, in response to the factual averment itself.[24] In this case, Harbor Freight specifically disputes both Plaintiffs' responses to its statement of uncontroverted facts, as well as Plaintiffs' additional statements of fact.[25] Harbor Freight does not merely refer to its motion to strike in its response and/or reply, but offers specific and detailed objections to facts that rely on Koentopp or Shadel's respective testimony, or the testimony of certain plaintiffs regarding other plaintiffs.[26] Accordingly, the Court declines to strike Plaintiffs' references to Koentopp and

---

[22]D. Kan. R. 56.1(d).

[23]*See Daniels v. United Parcel Serv., Inc.*, 797 F. Supp. 2d 1163, 1172 (D. Kan. 2011). Nor is it the appropriate method to object to Foster's affidavit. *See Solis v. La Familia Corp.*, No. 10-2400-EFM, 2013 WL 589613, at *2 (D. Kan. Feb. 14, 2013) (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1380 (3d ed. 2011)).

[24]*Id.*

[25]Docs. 456, 457.

[26]*Id.* Indeed, the responses submitted by Harbor Freight are so detailed, they are set out in table format, complete with specific objections and cross-references to facts and evidence for the Court's consideration.

Shadel's deposition testimony as set forth in their responses and Statement of Additional Uncontroverted Facts, and will instead disregard any testimony that is immaterial or otherwise does not comply with the relevant rules.

In so ruling, the Court notes that Plaintiffs filed suit on July 21, 2009; as named Plaintiffs, the statute of limitations for Plaintiffs' claims goes back three years from the date of filing.[27]  Thus, the relevant time period in question for the named Plaintiffs is July 21, 2006 to the present.

Rule 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to."  Koentopp was employed with Harbor Freight for thirteen years and served as a District Manager from January 2000 to July 2007.  During that time, Koentopp supervised Foster, Pace, Collins and Green.  Shadel worked at Harbor Freight for nineteen years and served as a District Manager between 2006 and April 2010.  During that time, Shadel supervised Foster, Green, Van Meter and Collins.  Thus, both had personal knowledge of the average amount of time they visited the stores in their district, how often they were in contact with their Store Managers, and what direction was given.  By contrast, their personal knowledge of a given Plaintiffs' day-to-day activities and performance of their duties is based on discussions with Plaintiffs and their perceptions as District Managers; both Koentopp and Shadel admit that they did not have personal knowledge of duties Plaintiffs actually performed on a daily basis. Because the Court's analysis is framed by the individualized nature of Plaintiffs' claims, it will disregard any testimony regarding Plaintiffs' actual day-to-day activities that is not based on the witness's personal knowledge or observation during the relevant time frame in which each

_____

[27]21 U.S.C. § 255(a).

directly supervised the respective Plaintiffs.  Likewise, the Court will limit the testimony of named Plaintiffs' to their personal experience working in multiple stores, or personal observation of other named or opt-in Plaintiffs.

Plaintiffs also purport to offer Koentopp and Shadel's testimony to establish Harbor Freight's corporate policies with respect to Store Managers.  This testimony is especially relevant to the primary duty factors, including establishing whether Plaintiffs were relatively free from direct supervision, as Plaintiffs contend that they were micro-managed through Harbor Freight's corporate policies, which rendered them Store Managers in name only. The foundation for this testimony is grounded in Koentopp and Shadel's years of experience with Harbor Freight and their personal knowledge and understanding of corporate policies as they relate to store managers in general.  The Court will consider this testimony.

## IV.    Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiffs.

Harbor Freight sells tools from more than 300 retail stores throughout the United States. Store Managers are the highest ranking employees in Harbor Freight stores.  All of Harbor Freight Store Managers' job duties and responsibilities are defined in a two-page job description as follows:

1.    Ensures excellent customer service.

2.    Assures that store is clean and well maintained.

3.    Trains and develops employees.  Selects, directs and evaluates personnel in all aspects of hiring, discipline, counseling, termination.

4.    Oversees or performs product inventory, ordering, receiving, opening and closing.

5.    Oversees or performs labor scheduling, hiring, wage administration, sales reporting, office procedure, receipts and deposits.

6.    Controls loss and inventory shrink. Responsible for store cash handling.

7.    Ensures an accident-free and non-violent workplace.

8.    Plans, assigns, delegates, and inspects work.

9.    Complies with Human Resources policies.

10.   Promotes honesty and integrity in all areas of store operations.

11.   Establishes and meets sales targets.

12.   Establishes and meets payroll and other budgets.

13.   Maintains proper merchandise categorization.

14.   Assures that store is properly signed, including signage for advertised specials.

15.   Assures that store handles price changes accurately and in a timely manner.

16.   Promotes goal of 95% "in stock" position.

17.   Promotes goal of 95% on store audits.

18.   Assures that store captures 97% of all customer zip codes.

19.   Assures that store captures name and addresses of customers for mailing lists.

20.   Performs other duties as required.[28]

_____

[28]Doc. 440, Ex. 46

9

In addition, the job description states that "Store Managers need to know and perform ALL store operations. They collect, organize, and file information as well as perform computer data entry, 10-key calculator, working closely with the general public, and speaking on the telephone."[29]

While there is a chain of command in the stores, such as cashiers reporting to the Head Cashier, all of the non-exempt store employees ultimately report to the Store Manager. Store Managers report to a District Manager, who have responsibility for approximately eight stores in their districts. District Managers report to Regional Managers, who are responsible for and oversee multiple districts, report to the Vice President of Retail Operations, and work through the Director of Retail Operations regarding daily operational matters.

Koentopp was employed with Harbor Freight for thirteen years and served as a District Manager from January 2000 to July 2007. During that time, Koentopp supervised Foster, Pace, Collins and Green. Shadel worked at Harbor Freight for nineteen years and served as a District Manager between 2006 and April 2010. During that time, Shadel supervised Foster, Green, Van Meter and Collins. Koentopp testified that his goal was to visit each store twice a month, but averaged a visit once every six weeks, and that he would spend more time in a store if it was new or had a special project that required him to be there. Shadel testified that he tried to visit his stores once every ten days, and that his goal was to speak to each Store Manager at least once a day. Shadel would email his Store Managers on a daily basis, averaging five emails a day.

Store Managers are responsible for product placement according to Harbor Freight's plan-o-grams, i.e., a store layout schematic. Store Managers are responsible for regularly providing performance reviews for their employees, using a form that assigned ratings. Harbor

---

[29]*Id.*

Freight's corporate office provides modules and training guides for Store Managers to conduct training programs. Store Managers' scheduling discretion was limited by corporate policy, as payroll hours were tied to profitability of a store. Koentopp testified that he would call his Store Managers every Monday to discuss revisions to their schedules.

Harbor Freight did not hire external candidates into Store Manager positions. Before they can be promoted to Store Managers, Assistant Store Managers are required to receive particular Store Manager training, and are required to pass an examination.

In October 2007 Harbor Freight transitioned from paying Store Managers their salaries on a semi-monthly basis to a bi-weekly basis. Store Managers were paid a salary and were not paid overtime for hours worked in excess of forty hours per week. As Store Managers, Plaintiffs' annual salaries ranged from approximately $40,000 to $70,000, and they were also eligible to receive "net profitability bonuses," which were based on their store's performance.

### Brent Foster

In early 2000, Foster was hired as an Assistant Store Manager at the store in Topeka, Kansas. In October 2000, Foster was promoted to Store Manager, where he worked until he resigned his employment on April 2, 2009. Foster's semi-monthly salary ranged from $1,718.14 to $1,013.52 between July 20, 2006 and April 1, 2009; during that period, he also earned three annual net profitability bonuses ranging from $12,940.00 to $15,407.24.

Foster testified that he was responsible for the overall operations of the store he managed. Foster testified in his deposition that he tried to "multi-task" when he performed manual tasks while working as Store Manager and overseeing other employees, and that sometimes he was successful, sometimes not. For example, when Foster was working in one of the warehouses, he

could not see or hear the employees in the store or other warehouse. He testified that if he did not have the employees to perform the manual tasks required to run the store, such as cleaning, stocking, and unloading the trucks, he had to perform those duties himself. Foster states that he worked on average sixty hours per week, and spent approximately 80-90% of his working hours performing manual labor. If his store exceeded the allowable payroll hours during a pay period by five percent or more, his District Manager directed him to decrease the payroll hours in the next pay period to bring the average within the acceptable limit.

Foster's District Managers visited his store on a variable basis, ranging from once or twice a month, to once or twice a week. He avers that he received between one and five emails a day from Koentopp and Shadel that included direction about what work needed to be done in the store. Foster also received visits, emails and phone calls from his Regional Manager once or twice a week during the last six months of his tenure at Harbor Freight, which also included direction about what work needed to be performed at the store. Foster also received regular contact and direction from the human resources, payroll, product, and safety departments on how to perform certain tasks.

### Stephanie Green

Green was hired as an Assistant Store Manager in Independence, Missouri, in 2002. She was promoted to Store Manager in August 2004, and was Store Manager in Shawnee, Kansas, until she resigned in August 2009. Green's semi-monthly salary ranged between $1,793.76 and $1,912.62, and she earned four annual net profitability bonuses ranging from $6,381.75 to $11,201.25.

Green testified that she spent approximately 10% of her time on tasks that could not be

delegated to other employees; and approximately 90% of her time doing non-exempt work, including operating the cash register, stocking shelves, unloading trucks, cleaning the sales floor and restrooms, and following plan-o-grams. Green testified that her duties as Store Manager were no different than those of non-managerial employees, and that ultimately, she did the same tasks as clerks and Assistant Managers. Although she spent some time completing tasks that could have been delegated to hourly employees, Green testified that she did so because she was not allowed to schedule overtime and had to work sixty hours a week to complete manual labor tasks. She could not discipline an employee without the approval of Human Resources, and could only recommend applicants for being hired without final decision-making authority, and that there were occasions where her recommendation to hire someone was not followed by corporate. Green had no discretion in determining her store's budget, which was set by corporate headquarters.

Throughout her tenure as Store Manager, Green reported to two District Managers, Koentopp and Shadel, who visited her store, on average, three or four times per month.

### Trey Pace

Pace began working for Harbor Freight in 2003. He was promoted to Assistant Store Manager at a store in Lincoln, Nebraska, and was promoted to Store Manager at the Sioux City, Iowa store in April 2008. Pace was terminated on February 26, 2009, because his job performance fell below company standards. Pace's semi-annual salary ranged from $1,576.92 to $1,655.77; he earned one net profitability bonus of $1,200.04 in 2008.

Pace testified that he spent 80 to 90% of his time as a Store Manager performing manual tasks, ranging from keeping the bathrooms clean, mopping floors, stocking the shelves, cleaning

up trash, unloading trucks, straightening and dusting product, and loading/unloading product for customers. Pace testified that he did not have authority to hire or fire employees and could not discipline employees without corporate approval. He testified that he was not allowed to schedule overtime if he was shorthanded, but instead was required to cover the employee's shift/ hours himself. Pace made promotion decisions for the Pricing Coordinator position, but otherwise contacted his District Manager for approval of promotions.

Pace's District Manager visited the store he managed once or twice a week.

### Dennis Collins

Collins was hired as an Assistant Store Manager at a store in Davenport, Iowa. He was promoted to Store Manager in August 2002, and worked in stores in Iowa, Missouri and Nebraska, until he was terminated in August 2008, because his job performance fell below company standards. Collins's semi-monthly salary ranged between $1,731.47 and $1,875.76; he earned two net profitability bonuses of $11,368.78 and $14,024.22.

Collins testified that when he worked the closing shift, he spent his time on manual-intensive tasks, such as merchandising, truck loading and unloading, carrying items for customers, cleaning restrooms, sweeping and mopping floors and shelves, and cleaning an upkeep of the store.

During his tenure as Store Manager, Collins reported to four District Managers. The frequency of store visits by the District Managers varied from once or twice a week, to once a month, to "just show[ing] up."

### Andy VanMeter

VanMeter was hired as an Assistant Store Manager at a store in Topeka, Kansas. He was

promoted to Store Manager in September 2002, and worked in stores in Minnesota, Florida, and Missouri, until he was terminated in April 2009 because he violated "standards of conduct." VanMeter's semi-monthly salary ranged between $1,880.97 and $2,059.22; he earned three net profitability bonuses ranging from $15,099.28 to $16,730.00.

Van Meter testified that as Store Manager, he was "basically . . . a stock boy," and that 80% of the work he did was physical, including unloading the truck, running the cash register and cleaning. He had no authority to give raises or to discipline employees without approval of the company. Van Meter disputes that he was able to delegate responsibility to Assistant Managers, since they perform essentially the same work as he did as Store Manager.

Van Meter's District Manager visited his store periodically.

## V.   Discussion

Under the FLSA, the general rule is that any employee who works more than forty hours in a workweek must receive overtime compensation.[30] Employers need not pay overtime, however, if the employee is "employed in a bona fide executive, administrative, or professional capacity" as defined by the regulations promulgated by the Secretary of Labor.[31] Harbor Freight, as the defendant, is entitled to summary judgment if it "raises at least one legally sufficient defense that would bar plaintiff's claim and that involves no triable issue of material fact."[32] In this case, Harbor Freight's asserted defense is that Plaintiffs are executive employees who were exempt from FLSA overtime requirements. While it is the employee's burden to prove that the

---

[30]*See* 29 U.S.C. § 207(a)(1) (2000).

[31]*See id.* § 213(a)(1).

[32]*Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008) (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2734 (3d ed. 1998)).

employer is violating the FLSA,[33] it is the defendant employer's burden to prove that the employee falls within one of these exceptions, all of which are narrowly construed against it.[34]

Under the Department of Labor regulations, an employee qualifies for the executive exemption if the employee: (1) is paid a salary not less than $455 per week; (2) has a primary duty of management; (3) regularly directs two or more employees; and (4) has "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight."[35]  Plaintiffs admit they received a salary in excess of $455 per week and they direct the work of more than two employees.  Thus, the only two requirements at issue are (2) whether Plaintiffs' "primary duty" was one of management and (4) whether Plaintiffs' suggestions and recommendations as to hiring, firing, advancement, promotion, or any other change of status of other employees was "given particular weight."

### A.        Primary Duty is One of Management

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs."[36]  To determine an employee's "primary duty," the court should consider all of the facts, with a "major emphasis on the character of the employee's job as a whole."[37]  As noted in the regulations,

_____

[33]*Id.* (citing *Christensen v. Harris County*, 529 U.S. 576, 585 (2000)).

[34]*Id.* (citing *Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999)).  As Defendant points out, these cases do not impose a heightened evidentiary burden for employers regarding summary judgment. *See Thomas v. Speedway SuperAmerica*, 506 F.3d 496, 502 n.2 (6th Cir. 2007).

[35]29 C.F.R. § 541.100(a)(1)-(4) (2005).

[36]*Id.* § 541.700(a).

[37]*Id.*

Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.[38]

"The determination of whether an employee is exempt from the overtime requirements of the FLSA is a 'highly fact intensive inquiry that must be made on a case-by-base basis in light of the totality of the circumstances.'"[39] The scope of the employee's duties is a question of fact, but "the question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law."[40]

"Management" work is exempt work.[41] The regulations provide that management duties include activities such as,

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery,

---

[38]*Id.*

[39]*Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 290 (E.D.N.Y. 2010) (quoting *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 908 (E.D. La. 2009)); *see also Costello v. Home Depot USA, Inc.*, —F. Supp. 2d—, 2013 WL 837586, at *15 (D. Conn. Mar. 5, 2013); *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361, 2010 WL 1327242, at *6 (S.D.N.Y. Mar. 31, 2010) ("Many courts have held that resolving this difficult and factual inquiry is inappropriate at summary judgment.").

[40]*Icicle Seafoods, Inc. v. Worthington*, 476 U.S. 709, 714 (1986).

[41]29 C.F.R. § 541.100 (2005). When an enterprise has more than one establishment, the employee in charge of each establishment may be considered in charge of a recognized subdivision of the enterprise. *Id.* § 541.103.

> equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.[42]

Thus, in deciding whether each Plaintiffs' "primary duty" was management, the Court must examine the tasks he or she performed as a Store Manager at their respective Harbor Freight stores.

### 1.    Relative Importance of Exempt Duties

The first factor, the relative importance of exempt duties, is analyzed from the employer's perspective.[43]  Numerous courts have found "this intensive fact-based inquiry is inappropriate for summary judgment."[44]  One logical way of addressing this factor is to consider how the store would function if the employee did not perform his or her managerial or non-managerial duties, respectively.[45]

Harbor Freight argues that Plaintiffs' job duties, salaries, "net profitability bonuses," and training dictate that their management responsibilities were relatively more important to Harbor Freight than any other ancillary tasks they may have undertaken.  Harbor Freight contends that Plaintiffs' managerial duties constituted their principal value to the company, which it claims is evident from Plaintiffs' accountability for the stores they managed, the rigor of the process of promotion and training that prepared Plaintiffs for their Store Manager duties, and Plaintiffs'

---

[42]*Id.* § 541.102.

[43]*Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990).

[44]*See Ely v. Dolgencorp, LLC*, 827 F. Supp. 2d 872, 886 (E.D. Ark. 2011) (collecting cases).

[45]*Plaunt v. Dolgencorp, Inc.*, Nos. 3:09cv079, 1:09cv084, 2010 WL 5158620, at *7 (M.D. Pa. Dec. 14, 2010) (citations omitted).

compensation arrangement, which included the receipt of bonuses tied directly to their store's performance. Plaintiffs dispute this characterization, and argue that their managerial duties were so insignificant that their positions were essentially interchangeable with any Assistant Store Manager, the difference being Harbor Freight was able to work Plaintiffs 60 to 80 hours a week without having to pay overtime. In addition to this overlap, Plaintiffs contend that there is evidence that the budget-based schedule left the stores understaffed at times, requiring Plaintiffs to perform non-exempt tasks themselves in order to get the required work done without paying overtime.

The Court concludes that there are genuine issues of material fact with respect to whether Plaintiffs' performance of management duties was of primary importance to Harbor Freight. The recent case of *Costello v. Home Depot USA, Inc.*,[46] is illustrative. In analyzing whether assistant store managers were exempt employees, the court found that summary judgment was precluded on this factor, in large part because Home Depot failed to submit any testimony from corporate officials as to how the company viewed the importance of the various tasks assigned to and carried out by the plaintiff.[47] The court concluded,

> [G]iven the absence of corroborating testimony from Home Depot officials or other employees regarding the importance of Costello's various tasks, divergent accounts of the amount of time actually spent on managerial tasks . . . , the degree to which those functions were replicated by lower-level employees, Costello's testimony that he was informed by supervisors that customer service was his primary job function, and his somewhat uncertain degree of influence on hiring decisions, a material issue of fact remains as to

---

[46]—F. Supp. 2d —, 2013 WL 837586 (D. Conn. Mar. 5, 2013).

[47]*Id*. at *18.

the relative importance of Costello's managerial functions.[48]

Similarly, in this case Harbor Freight fails to provide corroborating testimony or evidence from corporate officials or other employees as to whether Plaintiffs' managerial tasks were "critical to the success" of the stores.[49]  By allegedly refusing to allot more labor hours for non-managerial employees, forcing Plaintiffs to perform manual labor themselves, a jury could reasonably find that the manual labor was what Harbor Freight most valued.  On the other hand, the record indicates that if Plaintiffs did not perform their non-managerial functions, such as cleaning the store and restrooms, unloading delivery trucks or manning the cash register, their stores would not have functioned as well.  If, however, Plaintiffs did not perform their managerial functions, including scheduling hours, training and directing employees and implementing safety training and policies, a jury could conclude that the stores could not have functioned.  A reasonable jury could also conclude that, given the fact that Assistant Managers had similar job descriptions, if Plaintiffs were absent or did not perform their managerial duties, the stores would have continued to operate, albeit less efficiently.[50]  Viewing the evidence in a light most favorable to Plaintiffs, the Court determines that there are genuine issues of material fact with respect to whether Plaintiffs' performance of management duties was of primary

---

[48]*Id.* at *19.

[49]*See Tamas v. Family Video Movie Club, Inc.*, No. 11 C 1024, 2013 WL 1286693, at *6 (N.D. Ill. Mar. 28, 2013) (holding court cannot rely on defendant's unsupported assertion that the exempt duties that plaintiff performed were more or less important than her non-managerial duties, particularly where plaintiff offers evidence that she spent substantial time performing non-managerial duties) (citation omitted); *McKinney v. United Stor-All Ctrs., LLC*, 656 F. Supp. 2d 114, 124 (D.D.C. 2009) (finding defendants failed to demonstrate the facilities "would have ceased to function" if plaintiffs failed to perform their managerial tasks for purposes of summary judgment).

[50]*See Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 917 (E.D. La. 2009) (court concluded that plaintiffs' true import to the enterprise's success lay not in their managerial oversight, but in the substantial savings accrued in assigning costly overtime work to nonexempt employees).

importance to Harbor Freight.

## 2. Time Spent on Nonexempt Work

Plaintiffs have testified that 80 to 90% of their time was spent performing non-managerial tasks. While Harbor Freight characterizes this testimony as self-serving, the Court must accept Plaintiffs' testimony that they performed the sort of non-managerial tasks described 80 to 90 % of the time. The federal regulations state:

> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.[51]

As Harbor Freight notes, courts have consistently found that managers of retail establishments are exempt, "nothwithstanding the fact that they spent the majority of their time performing non-exempt tasks or their need to obey corporate policies and/or follow the orders of their corporate superiors."[52]

The regulations further state:

> Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis

---

[51]29 C.F.R. § 541.700(b).

[52]*See Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1302 (S.D. Fla. 2006) (collecting cases); s*ee, e.g.*, *Lovelady v. Allsup's Convenience Stores, Inc.*, 304 F. App'x 301, 305 (5th Cir. 2008); *Diaz v. Team Oney Inc.*, 291 F. App'x 947, 949 (11th Cir. 2008).

and based on the factors set forth in § 541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.[53]

The regulations offer as an example an assistant manager who supervises store employees and serves customers at the same time, without losing the executive exemption.[54]

Harbor Freight argues that as Store Managers, Plaintiffs chose when to perform exempt or nonexempt tasks, and when they chose to perform nonexempt work, they "multi-tasked" and remained responsible for managing their stores. Plaintiffs counter that they lacked such decision-making authority, and that every week, they spent the majority of their time unloading, unpacking, and stocking merchandise from a shipping truck, which on average took three or four days to complete. Plaintiffs further argue that they were not able to multi-task and manage the store in any meaningful way while unloading, unpacking, and stocking merchandise from the shipping trucks or while performing other nonexempt tasks such as cleaning the bathrooms.

While Harbor Freight contends that Plaintiffs chose to perform nonmanagerial tasks instead of delegating those tasks, viewing the evidence in a light most favorable to the non-movants, Plaintiffs were directed to perform tasks in the face of inadequate staffing levels. Moreover, the nonmanagerial time that took up most of Plaintiffs' time, unloading and unpacking of freight in the warehouse, would not allow for the supervision of employees in other

---

[53]29 C.F.R. § 541.106(a).

[54]*Id.* § 541.106(b).

sections of the store.  The Court concludes that, given the fact-intensive nature of this inquiry,

Harbor Freight has not conclusively shown that the nonexempt tasks were performed

concurrently with exempt tasks, for purposes of its affirmative defense.[55]  While not dispositive,

Plaintiffs' evidence that they spent 80 to 90 % of their time on nonexempt work weighs against

summary judgment on this factor.

### 3.     Relative Freedom from Direct Supervision

As a preliminary matter, the Court notes that Foster, Collins and VanMeter's

employment as Store Managers included periods both before and after the Primary Duty

Regulation's 2004 revision.  Prior to 2004, courts considered as a separate factor, the frequency

with which an employee exercised discretionary powers.  The current statutes no longer mention

"the frequency with which the employee exercises discretionary powers."[56]  However, courts

understand this factor to be incorporated into an analysis of an employee's "relative freedom

from supervision."[57]  Thus, the Court will analyze both together and attempt to explain any

potential differences to its analysis, should the exercise of discretion be considered a separate

factor.

Harbor Freight argues that Plaintiffs frequently exercised discretion, with minimal

---

[55]*See, e.g., Costello*, 2013 WL 837586, at *21 (noting lack of evidence as to whether plaintiffs were capable, given the tasks at hand, of simultaneously performing managerial and non-managerial tasks); *Davis v. Wal-Mart Stores, Inc.*, No. 3:10cv68-WHA, 2010 WL 3718834, at *5 (M.D. Ala. Sept. 13, 2010) (finding the nonexempt tasks performed by the plaintiffs were similar to those in *Morgan*, such as unloading freight, which would not allow for the supervision of associates in other sections of the store) (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1272-73 (11th Cir. 2008) (explaining "a store manager unloading a truck and stocking the storeroom was not concurrently supervising the cashier out front")).

[56]29 C.F.R. § 541.700(a).

[57]*See, e.g.*, *Morgan*, 551 F.3d at 1270 n.57("Having discretionary power is one aspect of freedom from supervision."); *Clougher v. Home Depot, U.S.A.* Inc., 696 F. Supp. 2d 285, 293 (E.D. N.Y. 2010) (citing *Johnson*, 604 F. Supp. 2d at 917).

oversight by their District Managers.  For example, Harbor Freight points to hiring, promotion, and pay increase decisions made by Plaintiffs.  Plaintiffs assert that far from exercising discretionary power, they were micro-managed through corporate policies, the human resources department, their District Managers, and fixed payroll budgets.  Plaintiffs claim that, while they performed many of the tasks listed by Harbor Freight, in many instances—specifically, those related to hiring, firing, product placement, scheduling, and ordering merchandise—ultimate decision-making power lay elsewhere and any decisions made were constrained by corporate policies.  The record also indicates that Plaintiffs received up to five emails a day from their District Managers, and calls between once a day and once a week.  Plaintiffs received an in-store visit from their District Managers between every ten days to twice a month.

Plaintiffs cite *Morgan v. Family Dollar Stores, Inc.*[58] in support of their argument that Harbor Freight's detailed manuals and policies make them non-exempt.  In that case, the Eleventh Circuit upheld a jury verdict in favor of the plaintiffs:

> Plaintiffs presented evidence that store managers rarely exercised discretion because either the operations manuals or the district managers' directives controlled virtually every aspect of a store's day-to-day operations.  The manuals and other corporate directives micro-managed the days and hours of store operations, the number of key sets for each store, who may possess the key sets, entire store layouts, the selection, presentation, and pricing of merchandise, promotions, payroll budgets, and staffing levels.  The manuals even instruct store managers on the smallest details, such as how to arrange clip boards, what items go in each of the four drawers of the single file cabinet, and how to remove spots and chewing gum from store mats.[59]

The *Morgan* court noted that Family Dollar district managers kept close involvement with the

[58] 551 F. 3d 1233, 1273 (11th Cir. 2008).

[59] *Id.* at 1270.

daily operations of the stores, and along with corporate headquarters, "made the vast majority of day-to-day decisions, and store managers had little discretion."[60]  The court summarized the trial evidence as follows:

> The few decisions not mandated by the manuals and corporate headquarters are vested in the district manager.  These decisions include the power to change store hours, close for bad weather, approve changes to store layouts, establish all employee's initial rates of pay, approve all pay raises, set payroll budgets, control the total labor hours allocated to each store, approve the hiring and firing of assistant managers, and even approve the use of appliances such as coffee pots.  Even when a store manager exercised discretion in scheduling employees for the week, she did so within the strict constraints of mandatory store hours, a limited payroll budget, a prohibition on overtime work by hourly employees, and a staff scheduler.  This evidence supports a reasonable jury finding that Family Dollar's store managers had few, and infrequently exercised, discretionary powers.[61]

By contrast, none of the Plaintiffs in this case testified that they were under such seemingly constant contact with their District Managers; in fact, their testimony makes clear that they were without direct supervision much of the time.  On the other hand, Plaintiffs have all testified that in conducting many of their duties, including meeting with their employees, hiring and discipline, scheduling, and store layout and placement, they abided by strict policies and procedures, the application of which left little room for independent judgment.  Of particular import is the direct supervision they received regarding scheduling; if a store was not performing well for the pay period, the District Manager would make adjustments on the number of hourly employees scheduled to work, which Plaintiffs testified led to them working extra hours to ensure all of the manual labor tasks they otherwise might have delegated were completed.

---

[60]*Id.*

[61]*Id.* at 1270-71.

Despite the fact that Plaintiffs had some level of discretion in certain discrete areas, however, genuine issues of disputed material facts exist as to whether overall Plaintiffs had a level of discretion consonant with an employee whose duties are primarily managerial. Because Harbor Freight has the burden of proving that Plaintiffs are exempt, this factor weighs against summary judgment.

### 4. Relationship Between Salary and Wages Paid to Other Employees

The final factor of the primary duty test compares the employee's salary to that of a non-exempt employee who performs the same non-managerial tasks. Harbor Freight argues that Plaintiffs' base salaries were nearly double the wages earned by most Assistant Store Managers, although the evidence submitted is limited to Plaintiffs Foster and Fetes.[62] Additionally, Plaintiffs could receive performance bonuses, which are not available to non-exempt employees. Plaintiffs counter that Harbor Freight's calculation assumes a forty-hour work week, which does not reflect the hours they actually worked, and frame the comparison in terms of their effectively hourly wage, based on a sixty-hour work week. Converting Plaintiffs' weekly salary to an hourly wage, Plaintiffs earned significantly less than Assistant Store Manager Jack Carver. Specifically, Plaintiffs calculate Carver's hourly rate for a forty-hour workweek at $19.94. Assuming a sixty-hour workweek for Plaintiffs, Carver would make between $4.10 and $7.21 an hour more than Plaintiffs.

Disparate compensation, including performance bonuses and stock options, has never

---

[62]Fetes was a conditional class member, and was dismissed from the case when the Court granted Harbor Freight's motion to decertify the class. Doc. 444.

been held strictly dispositive on this issue.[63]  Thus, while exempt executives often receive

compensation commensurate with greater corporate responsibility, the relevant focus is "upon

the degree and depth of that responsibility, not upon mere dollar figures."[64]  Nonetheless, the

Court concludes that converting Plaintiffs' weekly salary into an effective hourly wage is

appropriate in order to find a common basis with which to compare the wages paid to others.  As

one court explained, "[t]o ignore the fact that [Plaintiff] worked more than forty hours per week

would largely frustrate the purposes of this inquiry: to determine whether the employer sought to

subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs

the same non-exempt duties as hourly employees."[65]  Accordingly, the Court finds that there is a

genuine issue of fact as to whether Plaintiffs' effective hourly wage difference from their

Assistant Store Manager's hourly was is so significant as to justify their exemption from the

FLSA.

Taking all these factors together, it is clear that material issues of fact exist as to whether

Plaintiffs' primary duties at Harbor Freight were managerial.

**B.      Suggestions and Recommendations as to Change in Status are Given a
         Particular Weight**

Having concluded that there are questions of fact that preclude summary judgment in

Harbor Freight's favor on the exemption requirement of primary duty, the Court need not

---

[63]*Clougher v. Home Depot. U.S.A., Inc.*, 696 F. Supp. 2d 285, 293 (E.D. N.Y. 2010) (citing *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 917 (E.D. La. 2009)); *Pendlebury v. Starbucks Coffee Co.*, No. 04-80521-CIV, 2008 WL 763213, at *8 (S.D. Fla. Mar. 12, 2008).

[64]*Clougher*, 696 F. Supp. 2d at 293.

[65]*Plaunt v. Dolgencorp, Inc.*, Nos. 3:09cv079, 1:09cv084, 2010 WL 5158620, at *13 (M.D. Pa. Dec. 14, 2010).  The court further noted that another option would be to ask what the employer would have had to pay an Assistant Store Manager who worked fifty hours per week, as the plaintiff did.  *Id.* at n.10.

address the remaining requirement for application of the executive exemption. Nevertheless, the Court briefly discusses the fourth factor regarding suggestions and recommendations as to an employee's change of status. Harbor Freight does not suggest that Plaintiffs had the authority to hire and fire other employees, and there is no genuine dispute that Plaintiffs did not have such authority. The parties dispute, however, whether Plaintiffs' "suggestions and recommendations" as to the hiring, firing, advancement, or promotion of nonexempt employees were given "particular weight." The regulations provide the following guidance:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency to which such suggestions are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.[66]

Here, Plaintiffs do not offer any testimony on what percentage of their recommendations were ultimately relied upon, nor does Harbor Freight offer any affidavit testimony demonstrating that Plaintiffs' recommendations actually had an impact on those receiving them. While such evidence is not absolutely necessary in order to grant summary judgment, its absence fails to resolve the issue of material fact raised by Plaintiffs' testimony that their opinions were not accorded particular weight by their supervisors. Drawing all inferences in favor of Plaintiffs, as

---

[66]29 C.F.R. § 541.105.

the Court must, Harbor Freight has not established an absence of a material issue of fact as to this factor.

**VI.     Conclusion**

As discussed above, Harbor Freight has moved for summary judgment on the basis of an affirmative defense, which this Court is directed to construe narrowly.  The Court must conclude, viewing the evidence in a light most favorable to Plaintiffs, that material issues of fact exist as to whether each Plaintiffs' respective primary duty at Harbor Freight was, in fact, managerial. Given that question, the Court cannot grant summary judgment in Harbor Freight's favor.  A more fully developed record will greatly aid a jury in making an appropriate determination. Accordingly, the motions for summary judgment are denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Harbor Freight's Motion to Strike Testimony of Kent Koentopp and Ray Shadel (Doc. 458) is DENIED;

**IT IS FURTHER ORDERED** that Harbor Freight's Motions for Summary Judgment with respect to the remaining named Plaintiffs Foster, Green, Pace, Collins and Van Meter (Docs. 445, 447) are DENIED.

**IT IS SO ORDERED.**

Dated: <u>August 23, 2013</u>

<u> S/ Julie A. Robinson </u>

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE